## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

YA EMPLOYEE SERVICES, LLC AND R.L. YOUNG, LLC

    Plaintiffs,

VERSUS

BENJAMIN SPARKS, MATTHEW SPARKS, AND CALEB GIBBS

    Defendants.

CIV. NO. _____

JUDGE _____

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs, YA Employee Services, LLC ("YAES") and R.L. Young, LLC (collectively, "YA" or "Plaintiffs") respectfully file this *Verified Complaint for Damages and Injunctive Relief*. This action arises out of the unauthorized use of YA's trade secrets and confidential business information by former YA employees Benjamin Sparks, Matthew Sparks, and Caleb Gibbs (collectively, "Defendants") for the benefit of their newly formed business entity, Company X,[1] to unfairly compete in violation of Missouri and federal law and in breach of their contractual obligations. YA brings this action under the Defend Trade Secrets Act, 18 U.S.C. § 1125 *et seq.*

---

[1] Plaintiffs intend to discover the precise identity and business structure of Company X through discovery. Prior to filing this Complaint, Plaintiffs have been unable to determine the identity of the competitive entity and whether it was formed by Defendants Benjamin Sparks, Matthew Sparks, and Caleb Gibbs. Plaintiffs believe these Defendants formed a competing business entity weeks before their employment with YA ended because Defendants submitted a competitive bid to YA's customer while still employed by YA, and it is unlikely an established and operating competitor would take the risk of working with employees of another company to submit a competing bid. Therefore, Defendants likely formed a competing business entity, through which they unfairly submitted their competitive bid.

("DTSA"), the Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. § 417.450, *et seq.* ("MUTSA"), and various contractual and business tort causes of action under Missouri law.

## NATURE OF THE CASE

1.       This action arises from Defendants' coordinated scheme to unfairly compete with YA by soliciting business, diverting opportunities, and misusing confidential business information while still employed by YA and after they launched their competitive entity.

2.       Defendants owed YA contractual duties, duties of loyalty, and statutory obligations to protect YA's confidential business information and trade secrets. But Defendants disregarded these obligations to launch a competing enterprise, undermine YA's goodwill, and misappropriate valuable confidential business information to divert business from the sole customer they serviced while employed by YA. Defendants have then further breached those duties by trying to solicit YA employees to join them and expand the scope of their unlawful conduct.

3.       Defendants' misconduct violates the DTSA, the MUTSA, Missouri common law duties of loyalty, and Missouri contract and tort law.

4.       Unless enjoined, Defendants' misconduct will continue to cause irreparable harm to YA, including loss of customer relationships, erosion of goodwill, loss of employees, and unfair competitive disadvantage that cannot be adequately remedied by money damages alone.

## PARTIES

5.       Plaintiffs are each a limited liability company organized under the laws of the State of Delaware, with their principal places of business in St. Louis, Missouri.

6.       Defendant Mathew Sparks, a former employee of YA, is an individual domiciled in or around Dripping Springs, Texas.

7.    Defendant Benjamin Sparks, a former employee of YA, is an individual domiciled in or around Rio Rancho, New Mexico.

8.    Defendant Caleb Gibbs, a former employee of YA, is an individual domiciled in or around Nampa, Idaho.

## JURISDICTION AND VENUE

9.    The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and § 1367. This case presents a claim arising under the laws of the United States, specifically the DTSA. The remaining state law claims arise from the same operative facts as the DTSA claim, and thus the Court has supplemental jurisdiction to hear those claims.

10.    The Court may exercise personal jurisdiction over Defendants because Plaintiffs' claims arise specifically out of the Defendants' contacts with YA, their former Missouri-based employer. Further, each of the Defendants agreed, at the outset of their employment, that any claims arising out of their alleged breach of any obligations owed to YA "shall be commenced and maintained in a court of competent jurisdiction in the State of Missouri" (Exhibits 1-3, the Loyalty Agreements executed by Defendants Benjamin Sparks, Matthew Sparks, and Caleb Gibbs respectively—the "Loyalty Agreements") and the harm caused by Defendants' misconduct was suffered in Missouri.

11.    Venue is proper in the Eastern District of Missouri under 28 U.S.C. § 1391, as a substantial part of the damages suffered as a result of the actions that give rise to these claims occurred in this district where YA, the employer from whom Defendants received benefits and harmed, is located; and each of the Defendants agreed under the Loyalty Agreements that any claims arising out of their alleged breach of any obligations owed to YA "shall be commenced and maintained in a court of competent jurisdiction in the State of Missouri."

## FACTUAL BACKGROUND

### *YA's Business and Its Trade Secrets*

12.     YA is a national consulting firm which specializes, as relevant to the claims in this case, in construction scheduling, project controls, and related advisory services for complex capital projects. YA's contracts with its customers often generate significant revenues and span multiple years. Securing and maintaining one contract positions YA to have the ability to win repeat business on that same project or other future projects with the same customer.

13.     The company was started nearly thirty (30) years ago by Ray and Linda Young right here in St. Louis, Missouri. Since its inception as a family business in 1997, YA has grown its technical expertise, services, and presence to span the globe with added capabilities to better serve the needs of its clients.

14.     YA's consultants on the Planning & Construction Advisory Services Team provide expert project management, building scheduling, and cost estimate consulting services to companies across the country to assist with the budgeting, planning, design, and construction of those building projects.

15.     A critical arm of the broader Planning & Construction Advisory Services Team is the Construction Scheduling Team, which specializes in project-wide scheduling expertise and assists in coordinating and centralizing the timelines for numerous contractors and subcontractors into manageable databases, among other services. YA's Construction Scheduling experts help customers timely complete projects within budget.

16.     Defendants Benjamin Sparks, Matthew Sparks, and Caleb Gibbs were employees on YA's Construction Scheduling Team, serving as Construction Scheduling Consultants.

17.     YA invests substantial time, money, and effort in developing and maintaining its Construction Scheduling Team's services, including cultivating client relationships and goodwill; researching customer needs; developing marketing strategies; creating financial and business forecasts; and designing pricing structures, methodologies, scheduling tools, workflows, proprietary processes, and confidential project-specific and client-specific information. These efforts depend on the accumulation, application, and secrecy of YA's confidential business information and are critical to its success in a highly competitive market. As a result, YA's confidential business information — including client-specific pricing history and rate structures; staffing, resourcing, and forecasting models; internal cost, margin, and profitability data; quarterly manpower proposals and proposal templates; proprietary scheduling methodologies and workflows; project schedules and analytical outputs generated through YA's licensed proprietary softwares; client specific project timelines, budgeting sensitivities, procurement practices, and continuity preferences — derives substantial independent economic value from not being generally known or readily ascertainable by competitors.

18.     This information is not publicly known, derives independent economic value, and is protected by contractual restrictions and reasonable security measures, which includes, but is not limited to, password protected computer systems and limiting access to this information to select employees on a need-to-know basis.

### *Acquisition of Encore and Assumed Relationships*

19.     On or about March 21, 2025, via a confidential Asset Purchase Agreement (the "APA"), YA acquired substantially all the business assets of Encore Group North America LLC and its affiliates (collectively, "Encore"), including, but not limited to, customer relationships and goodwill. YA paid significant consideration for Encore's customer relationships, as it was one of

Encore's main assets in the APA. This includes, as discussed below, one of Encore's main customers, Customer I (discussed below).

20.    Prior to the acquisition, Encore provided construction scheduling services, construction-delay analysis and consulting, and assisted with construction claim support. YA folded the Encore assets into its business and formed its Planning & Construction Advisory Services Team.

21.    Through the APA, YA acquired Encore's business relationship and all attendant goodwill with its customers.

22.    Prior to the APA, Defendants Ben Sparks, Matthew Sparks, and Caleb Gibbs were employed by Encore and provided construction scheduling and planning consulting to Encore's customers.

23.    As part of the acquisition, Defendants Ben Sparks, Matthew Sparks, and Caleb Gibbs were hired by YA to maintain those acquired customer relationships, for the benefit of YA, by meeting the customers' needs as part of YA's Construction Scheduling Team. That is to say, Defendants were entrusted as employees of YA to maintain the goodwill YA purchased from Encore with the key customers they had previously serviced while with Encore.

### *Defendants' Agreements and Duties*

24.    As a condition of employment with YA and as part of their onboarding, each Defendant executed a Loyalty Agreement governed by Missouri law on or about March 18, 2025. Exhibits 1-3.

25.     Under the Loyalty Agreements, each Defendant expressly agreed: (1) to act with undivided loyalty to YA[2] during employment; (2) to refrain from misusing confidential information; (3) not to solicit YA clients or employes during employment and for six months after the employment relationship terminates; and (4) to submit to injunctive relief for any breach or threatened breach of their competitive restrictions.

26.     Specifically, under Section 1 of the Loyalty Agreements, each Defendant agreed to "serve the interests of [YA] faithfully and diligently, with undivided loyalty to [YA]." Exhibits 1-3, at § 1.

27.     Further, under Section 4 of the Loyalty Agreements, each Defendant agreed that, "during his/her employment by [YA] and for a period of six (6) months after his/her employment terminates with [YA] for any reason, whether voluntarily or involuntarily, Employee will not, directly or indirectly: (i) induce or seek to influence any 'Existing Clients' of the Company to discontinue or reduce their business relationship with the Company; (ii) solicit, accept, or facilitate the acceptance of any 'Competing Business' from any 'Existing Clients' or 'Target Clients' of the Company, except for the exclusive benefit of the Company; or (c) assist or cause any person or entity to engage in any of the actions in which Employee has agreed not to engage under this section." Exhibits 1-3, at § 4.

28.     The Loyalty Agreements define "Existing Clients" to mean "customers of the Company for whom Employee personally provided services to or had a business relationship with while at the Company within (6) months immediately prior to his/her termination of employment from [YA]." *Id.*

---

[2]     Under the Loyalty Agreements, "Company" is defined as YA Employee Services together with RL Young, LLC and YA Engineering Services, LLC

29.     If there was any question about whether a customer qualified as an "Existing Client" under the Loyalty Agreements, Defendants were contractually required to seek clarity from YA. *Id.*

30.     The Loyalty Agreements further define "Competing Business" to mean "damage assessment, cost estimating, and project management services to insureds, adjusters, insurers or other customers in the U.S." *Id.*

31.     Under Section 5 of the Loyalty Agreements, each Defendant agreed that "during his/her employment with [YA] and for a period of six (6) months after his/her employment terminates with [YA] for any reason, whether voluntarily or involuntarily, Employee will not, directly or indirectly: (i) solicit, contact, communicate with, encourage, or assist any of the [YA]'s employees where a purpose is to cause any of them to leave the employ of [YA] or to become employed or retained by another person or entity; (ii) employ, seek to employ, or encourage or assist any person or entity to seek to employ or retain any employees of [YA] or to seek to cause such employees to leave the employ of [YA] or to become employed or retained by another person or entity; or (iii) provide any information to another person or entity about the wages, bonuses, benefits, performance, or work quality of any Company employees to assist such other person or entity to become employed or retained by such other person or entity."

32.     Finally, under Section 6 of the Loyalty Agreements, Defendants were required to notify YA of any new or prospective employers "to ensure compliance" with the contractual obligations within the Loyalty Agreements.

33.     Independent of their contractual obligations, Defendants also owed YA common-law duties of loyalty, fidelity, and good faith while employed.

### *YA's Relationship with Customer I and the Defendants' Roles*

34.    YA provides construction scheduling, project controls, and planning advisory services to sophisticated enterprise clients, including Customer I[3], one of the YA Planning & Construction Advisory Services business's largest and most strategically important clients.

35.    Customer I engages YA on a recurring basis for capital construction projects involving semiconductor fabrication facilities, including new builds and retrofits, where precise scheduling, coordination of subcontractors, and milestone forecasting are mission critical.

36.    YA's work for Customer I is not performed pursuant to a traditional public RFP process. Instead, Customer I regularly requests "resource forecasts" from YA identifying staffing, pricing, and allocation of scheduling professionals across specified projects on a quarterly basis.

37.    Continuity of personnel and institutional knowledge are critically important to Customer I, as it heavily relies on YA's confidential methodologies, staffing models, and historical project data when deciding whether to continue engagement quarter-to-quarter. This is the customer goodwill YA paid significant sums for when it purchased Encore and sought to protect with the limited restrictions within its Loyalty Agreement.

38.    YA's goodwill with Customer I took years to develop and cost YA millions of dollars to acquire and further develop.  More specifically, Customer I was one of Encore's main customers, and YA purchased Encore's goodwill with Customer I through the APA. YA's ability to continue to provide services to and expand those services to Encore's enterprise clients like Customer I was one of the main purposes of the acquisition. Encore's employees were then hired by YA to maintain and further develop that goodwill with YA's name, resources, and capabilities.

---

[3]    YA seeks to protect the identity of its customer and, therefore, refers to it as Customer I.

39.     Before the APA, Defendants Benjamin Sparks and Matthew Sparks serviced Customer I and personally provided construction scheduling services for Customer I on behalf of Encore.[4] Following the APA, Defendants Benjamin Sparks and Matthew Sparks continued to provide those construction scheduling services to Customer I on behalf of YA. Even though he did not work with Customer I while employed by Encore, Defendant Caleb Gibbs was also tasked with providing construction scheduling services for Customer I after the APA.

40.     In their roles as Construction Scheduling Consultants for YA, Defendants Benjamin Sparks, Matthew Sparks, and Caleb Gibbs were entrusted with access to the following confidential information in order to provided construction scheduling services to Customer I: (1) Customer I's specific scheduling data, (2) YA pricing and staffing models, (3) internal forecasts and quarterly manpower proposals, and (4) proprietary scheduling tools, including YA's licensed access to Schedule Validator.

41.     Importantly, Defendant Caleb Gibbs served in a role that required day-to-day interaction with Customer I project personnel and provided him with direct responsibility for preparing and maintaining project schedules for Customer I's construction projects.

42.     Customer I is an "Existing Client" within the meaning ascribed in the Loyalty Agreements.

### *Defendants' Disloyal Conduct While Still Employed by YA*

43.     Upon information and belief, while still employed by YA, Defendants secretly began planning and executing a competitive effort to take YA's work with Customer I.

---

[4]     Defendant Caleb Gibbs did not provide services to Customer I while employed by Encore. His first time servicing Customer I was while employed by YA.

44.    Defendants formed or aligned themselves with a competing scheduling consultancy ("Company X") for the purpose of providing the same construction scheduling services to Customer I that YA had been providing (and that Defendants had been working to provide to Customer I on behalf of, and as employees of, YA).

45.    Company X is a Competing Business within the meaning ascribed in the Loyalty Agreements.

46.    Critically, while still employed by YA, Defendants prepared and submitted a competing bid or proposal to Customer I for its scheduling work that YA was actively performing or expected to continue to perform as YA had done since acquiring the Encore business.

47.    This bid submission occurred prior to the Defendants' unexpected resignations from YA and necessarily relied upon the following: YA's confidential Customer I pricing history (including Encore's pricing history with Customer I, which YA acquired under the APA), knowledge of YA's quarterly proposal structure, inside information regarding Customer I's staffing expectations, and YA's confidential understanding of Customer I's project timelines and budgeting sensitivities.

48.    Despite the requirements in each of the Defendant's Loyalty Agreement with YA, Defendants did not disclose to YA that they were preparing or participating in a competing bid *while still employed by YA*, nor did they seek authorization to do so. Further, Defendants did not notify YA that they were seeking employment with a competitor or seek clarity on whether Customer I was considered an "Existing Client."

49.    The bidding process for Customer I's work occurs weeks before the end of each quarter, meaning that Defendants necessarily took these competitive steps while they were still drawing salaries and enjoying access to YA's confidential systems and information. Specifically,

any bids for Customer I's Q2, 2026 work for Project Denver was due March 13, 2026, and Defendants resigned from YA on or about March 24, 2026.

50.    By submitting a competing bid to Customer I while still employed by YA, the Defendants (1) usurped a corporate opportunity belonging to YA, (2) acted in direct competition with their employer, and (3) breached their duties of loyalty as a matter of Missouri law.

### *Defendants' Abrupt Departure and Immediate Transition of Customer I Work*

51.    Defendants abruptly resigned on March 24, 2026, without ever notifying YA of their subsequent employer under Section 6(b) of the Loyalty Agreements, and upon information and belief, they began working for Company X in the same or similar roles that they had while YA employees.

52.    After the Defendants' resignations, they transitioned almost immediately into competitive work related to Customer I's scheduling projects, including projects which had previously been staffed and managed while employed by YA.

53.    The speed and seamlessness of this transition reflect that the competitive work had already been secured or substantially arranged before Defendants' resignations, confirming pre-departure disloyal conduct.

### *Misappropriation of YA's Trade Secrets—Schedule Validator*

54.    YA maintains a licensed, enterprise-level access to a proprietary software platform known as Schedule Validator, which it uses to analyze, audit, and "health-check" construction schedules.

55.    YA's confidential business information maintained using the Schedule Validator software constitutes a commercially valuable trade secret resource because: (1) it reveals weaknesses, logic errors, and sequencing vulnerabilities in construction schedules; (2) it embeds

proprietary analytical criteria not available from generic scheduling tools; and (3) YA maintains access under licensing conditions and criteria with the software's licensor.

56.    Access to YA's confidential business information on the Schedule Validator platform is restricted to authorized YA personnel using YA-issued credentials.

57.    After leaving YA, Defendant Caleb Gibbs used Schedule Validator and improperly accessed YA's confidential business information on the platform using YA credentials in order to service Customer I on behalf of Company X, despite no longer being authorized to do so.

58.    On information and belief, Gibbs used Schedule Validator in connection with competitive work for Customer I or Customer I-related projects, thereby (1) exploiting YA's paid license, (2) using YA's proprietary and confidential analytical outputs to benefit a competitor, and (3) obtaining an unfair competitive advantage not available to legitimate competitors.

59.    Gibbs improperly used YA credentials to gain unauthorized access to Schedule Validator, at minimum, on Monday, April 13, 2026, and Friday, April 17, 2026.

60.    This unauthorized access and use constitutes misappropriation of trade secrets, as well as improper acquisition by "improper means" under federal and Missouri law.

61.    At all times material to the misappropriation of trade secrets, Gibbs was acting in the course and scope of his employment with Company X and working with the blessing, consent, and agreement of Defendants Benjamin Sparks and Matthew Sparks.

### *Defendants' Improper Solicitation of a YA Employee*

62.    Defendant Caleb Gibbs, likely in concert with the other Defendants, has also been actively soliciting his former YA coworkers to leave and join him at Company X.

63.    Specifically, in the weeks following his unexpected resignation, Defendant Caleb Gibbs solicited and attempted to entice multiple YA employees (the employees he worked with to

service Customer I for YA) in direct violation of his obligations under Section 5 of his Loyalty Agreement. In more recent weeks, he has scheduled or attempted to schedule in-person meetings and/or dinners with the YA leads on Customer I projects.

64.     Defendant Caleb Gibbs' actions indicate Defendants are trying to expand the scope of competitive services they are providing to Customer I in direct violation of their contractual duties and while in possession of and making use of YA's confidential information.

65.     At all times material to solicitation of YA's employees, Gibbs was acting in the course and scope of his employment with Company X and working with the blessing, consent, and agreement of Defendants Benjamin Sparks and Matthew Sparks.

## CAUSES OF ACTION

### COUNT 1
### *Violation of the Defend Trade Secrets Act*
### (Against all Defendants)

66.     YA repeats and re-alleges each of the allegations of the preceding paragraphs as if fully stated here.

67.     The DTSA defines a trade secret as, *inter alia*, "all forms and types of financial, business, scientific, technical, economic, or engineering information . . . whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing" provided that the owner took "reasonable measures to keep such information secret," and it offers the holder of the trade secret an advantage over competitors who do not use the trade secret.

68.     YA owns valuable trade secrets including, as relevant here: Customer I-specific pricing history and rate structures; staffing, resourcing, and forecasting models; quarterly manpower proposals and proposal templates; internal cost, margin and profitability data; project schedules, analytics, and outputs generated through Schedule Validator; confidential project

methodologies, workflows, and proprietary tools; and non-public knowledge of Customer I's procurement practices, timelines, budgeting sensitivities, and continuity preferences (collectively, the "YA Trade Secrets").

69.    The YA Trade Secrets derive independent economic value from not being generally known or readily ascertainable by competitors and were the subject of reasonable measures undertaken by YA to maintain their secrecy, including restricting access to authorized personnel, using secure credentials and systems, and requiring employees to execute Loyalty Agreements and confidentiality obligations.

70.    The YA Trade Secrets are related to products and services offered by YA in interstate commerce.

71.    Defendants Benjamin Sparks, Matthew Sparks, and Caleb Gibbs were entrusted with authorized access to the YA Trade Secrets solely for the purpose of performing their job duties on behalf of YA and for YA's benefit.

72.    While still employed by YA, Defendants improperly acquired, used, and disclosed the YA Trade Secrets by, upon information and belief: relying on this information to secretly prepare and submit a competing bid to Customer I; exploit YA's confidential Customer I pricing, staffing, forecasting information, and proprietary proposal structures to undercut YA; and position Company X to immediately take over YA's Customer I work upon their abrupt resignations.

73.    After leaving YA, Defendant Caleb Gibbs further misappropriated the YA Trade Secrets by accessing and using Schedule Validator with YA-issued credentials despite no longer being authorized to do so, including on multiple occasions in April 2026, to service Customer I on behalf of Company X.

74. Defendants' acquisition, disclosure, and use of the YA Trade Secrets were accomplished through "improper means" within the meaning of the DTSA, including breach of duties of loyalty and confidentiality, unauthorized access to protected systems, and use of information obtained under circumstances giving rise to a duty to maintain its secrecy.

75. Upon information and belief, Defendants disclosed the YA Trade Secrets to Company X and continue to use those YA Trade Secrets to compete unfairly against YA, and Company X knew or had reason to know that the YA Trade Secrets were acquired and used by Defendants through improper means and nonetheless accepted, encouraged, and unjustly benefitted from such misappropriation.

76. Furthermore, Defendants conspired with one another to achieve the theft of trade secrets to benefit Company X. Acting in concert with one another, Defendants agreed on the object of misappropriating YA Trade Secrets and committed unlawful overt acts in the furtherance of such object with the aim to accomplish it, and such conspiracy resulted in damages to YA.

77. As a direct and proximate result of Defendants' and Company X's violations of the DTSA, YA has suffered and continues to suffer irreparable harm, loss of business and goodwill, loss of competitive advantage, and unjust enrichment to Defendants and Company X.

78. Furthermore, the Defendants conspired with one another to achieve the theft of trade secrets to benefit Company X. Acting in concert with one another, Defendants agreed on the object of misappropriating YA Trade Secrets, and committed unlawful overt acts in the furtherance of such object with the aim to accomplish it, and such conspiracy resulted in damages to YA.

79. Unless enjoined, Defendants and Company X will continue to use and disclose YA's Trade Secrets, resulting in ongoing and irreparable harm to YA, including loss of customer relationships, loss of goodwill, erosion of competitively sensitive information, and loss of the value

of YA's investment in its YA Trade Secrets—harms that cannot be adequately remedied by monetary damages alone.

80.     YA has no adequate remedy at law because once its YA Trade Secrets are disclosed or exploited by competitors, their secrecy and independent economic value will be permanently destroyed, and YA's competitive position with respect to Customer I and other current and prospective customers will be irreparably impaired.

81.     Defendants' and Company X's willful and ongoing misconduct justifies the issuance of injunctive relief under the DTSA, 18 U.S.C. § 1836(b)(3)(A), to prevent actual and threatened misappropriation and to eliminate the commercial advantage derived from Defendants' and Company X's unlawful use of YA's Trade Secrets.

82.     The balance of the equities weighs strongly in favor of injunctive relief, and the public interest is served by preventing unfair competition, enforcing statutory and contractual duties, and protecting the confidentiality of proprietary business information.

### COUNT 2
### *Violation of the Missouri Uniform Trade Secrets Act*
### (Against all Defendants)

83.     YA repeats and re-alleges each and every allegation of the preceding paragraphs as if fully set forth herein.

84.     The Missouri Uniform Trade Secrets Act ("MUTSA"), Mo. Rev. Stat. § 417.450 *et seq.*, protects trade secrets from misappropriation and provides remedies for actual and threatened misuse.

85.     Under MUTSA, "trade secrets" include information, including business, technical, and economic information, that (a) derives independent economic value from not being generally

known or readily ascertainable by proper means by others who can obtain economic value from its disclosure or use, and (b) is the subject of reasonable efforts to maintain its secrecy.

86.    The list of "YA Trade Secrets" owned by YA and enumerated under Count 1, *supra*, qualifies as trade secrets under the MUTSA.

87.    YA undertook reasonable measures to maintain the secrecy of its YA Trade Secrets, including restricting access to authorized personnel, using secure systems and credentials, requiring employees to execute Loyalty Agreements and confidentiality obligations, and limiting disclosure of confidential information on a need-to-know basis.

88.    Defendants Benjamin Sparks, Matthew Sparks, and Caleb Gibbs had authorized access to YA's Trade Secrets solely for the purpose of performing their job duties on behalf of YA and for YA's benefit.

89.    While still employed by YA, Defendants improperly acquired, used, and disclosed the YA Trade Secrets by, upon information and belief, relying on this information to secretly prepare and submit a competing bid to Customer I; to exploit YA's confidential Customer I pricing, staffing, forecasting information, and proprietary proposal structures to undercut YA; and to position Company X to immediately take over YA's Customer I work upon their abrupt resignations from YA to perform the same or similar roles with Company X.

90.    After leaving YA, Defendant Caleb Gibbs further misappropriated YA's Trade Secrets by accessing and using Schedule Validator with YA-issued credentials despite no longer being authorized to do so, including on multiple occasions in April 2026, to service Customer I on behalf of Company X.

91.    Defendants' acquisition, disclosure, and use of YA's Trade Secrets were accomplished through "improper means" within the meaning of MUTSA, including breach of

duties of loyalty and confidentiality, unauthorized access to protected systems, and use of information obtained under circumstances giving rise to a duty to maintain its secrecy.

92.    Furthermore, Defendants conspired with one another to achieve the theft of trade secrets to benefit Company X. Acting in concert with one another, Defendants agreed on the object of misappropriating YA Trade Secrets and committed unlawful overt acts in the furtherance of such object with the aim to accomplish it, and such conspiracy resulted in damages to YA.

93.    Upon information and belief, Defendants disclosed YA's Trade Secrets to Company X and continue to use those YA Trade Secrets to compete unfairly against YA for their own and Company X's benefit.

94.    Company X knew or had reason to know that YA's Trade Secrets were acquired and used by Defendants through improper means and nonetheless accepted, encouraged, and benefitted from such misappropriation.

95.    Defendants' and Company X's acts constitute "misappropriation" of trade secrets in violation of Mo. Rev. Stat. § 417.453.

96.    As a direct and proximate result of Defendants' and Company X's violations of the Missouri Uniform Trade Secrets Act, YA has suffered and continues to suffer significant damages, including loss of business, loss of goodwill, loss of competitive advantage, and unjust enrichment to Defendants and Company X.

97.    Defendants' and Company X's conduct was willful and malicious, entitling YA to exemplary damages and an award of attorneys' fees under Mo. Rev. Stat. §§ 417.457 and 417.458.

98.    Unless Defendants and Company X are enjoined, they will continue to misuse YA's Trade Secrets, causing irreparable harm for which YA has no adequate remedy at law.

99.     YA is therefore entitled to all relief available under MUTSA, including injunctive relief, damages, exemplary damages, attorneys' fees, costs, and such other relief as the Court deems just and proper.

100.    The Missouri Uniform Trade Secrets Act expressly authorizes injunctive relief to prevent actual or threatened misappropriation of trade secrets. Mo. Rev. Stat. § 417.455.

101.    As set forth above, Defendants engaged in a conspiracy to misappropriate YA Trade Secrets and continue to misappropriate YA's Trade Secrets by improperly acquiring, using, and disclosing confidential and proprietary information for the benefit of themselves and Company X with the latter's knowledge and consent.

102.    Defendants' and Company X's misappropriation has provided, and continues to provide, Company X with an unfair competitive advantage and "head start" in competing against YA, including in connection with Customer I projects previously performed by YA.

103.    Unless enjoined, Defendants and Company X will continue to use and disclose YA's Trade Secrets, resulting in ongoing and irreparable harm to YA, including loss of customer relationships, loss of goodwill, and erosion of competitively sensitive information that cannot be adequately compensated by monetary damages alone.

104.    YA has no adequate remedy at law because once its Trade Secrets are disclosed or used by competitors, their secrecy and value will be permanently destroyed.

105.    The threatened injury to YA outweighs any harm an injunction may cause Defendants and Company X, who have no legitimate right to use or benefit from misappropriated trade secrets.

106.    The public interest favors the issuance of injunctive relief to prevent unfair competition, enforce contractual and statutory duties, and protect innovation and confidential business information.

107.    Pursuant to Mo. Rev. Stat. § 417.455, YA seeks injunctive relief prohibiting Defendants and Company X, and all persons or entities acting in concert with them, from: (1) using, disclosing, or disseminating YA's Trade Secrets or confidential and proprietary information; (2) performing work for Customer I or any other YA customer using or derived from YA's Trade Secrets; (3) accessing YA's electronic systems, software platforms, or proprietary tools, including Schedule Validator; and (4) retaining any documents, data, or materials containing YA's Trade Secrets.

108.    YA further seeks an order requiring Defendants to return, delete, and certify the destruction of all YA Trade Secrets and confidential information in their possession, custody, or control.

109.    YA seeks such injunctive relief for so long as necessary to eliminate the commercial advantage derived from Defendants' misappropriation, as expressly authorized by Missouri law.

**COUNT 3**
***Breach of Contract (Loyalty Agreement)***
***(Against all Defendants)***

110.    YA repeats and re-alleges each of the allegations of the preceding paragraphs as if fully stated here.

111.    The Loyalty Agreements executed between each Defendant and YA are valid and binding contracts.

112.    YA has complied with all applicable provisions of the Loyalty Agreements.

113.    Defendants Benjamin Sparks, Matthew Sparks, and Caleb Gibbs owed YA obligations under the Loyalty Agreements, which they executed in connection with their employment and in exchange for due compensation.

114.    Each Defendant breached his obligations under the Loyalty Agreements when Defendants conspired to submit a competing bid to YA's customer, Customer I, while still employed by YA.

115.    Further, within the 6-month restrictive period, each Defendant further breached his obligations under Section 4 of the Loyalty Agreement by directly attempting to induce YA's Existing Client, Customer I, to discontinue its business with YA and commence business with Defendants' newly formed Competing Business, Company X.

116.    Moreover, Defendant Caleb Gibbs, acting on behalf of Company X and his co-conspirators, further breached his obligations under Section 5 of his Loyalty Agreement by soliciting several YA employees to cease their employment relationship with YA and join Company X.

117.    Finally, each Defendant agreed with all other Defendants upon the object of unlawfully competing with YA and committed unlawful overt acts in the furtherance of such object with the aim to accomplish it, and such conspiracy resulted in damages to YA.

118.    As a direct result of Defendants actions, YA has suffered damages in the form of lost business, lost business opportunities, and lost profits.

### COUNT 4
### *Breach of Duty of Loyalty*
### *(Against Defendants)*

119.    YA repeats and re-alleges each of the allegations of the preceding paragraphs as if fully stated here.

120. During each Defendant's employment by YA, Defendants owed a common law duty of loyalty under Missouri law to act in YA's best interest and, at the very least, not to directly compete against YA.

121. Defendants breached this duty when they secretly formed a competing business, misappropriated YA's Trade Secrets and confidential information to concoct a competing bid for the work of YA's Existing Client, Customer I, and submitted such competing bid to Customer I while still employed by YA.

122. As a direct result of Defendants' actions, YA has suffered damages in the form of lost business, lost business opportunities, and lost profits.

### COUNT 5
### *Tortious Interference with Business Expectancy*
### (Against Defendants and Company X)

123. YA repeats and re-alleges each of the allegations of the preceding paragraphs as if fully stated here.

124. At all relevant times, YA held valid contractual and business relationships with its client Customer I and reasonably expected such contractual and business relationships to continue each quarter when Customer I decided whether to renew such contractual and business relationships.

125. Defendants each knew the intimate details of YA's contractual and business relationships with Customer I because they served those very same relationships while employed by YA.

126. Defendants, acting individually and on behalf of Company X, intentionally interfered with YA's contractual and business relationships with Customer I when they improperly

submitted competing bids, while still employed by YA and while still in possession of YA Trade Secrets, on the work being performed by YA for Customer I.

127. The interference by Defendants sought to induce Customer I to discontinue certain of its contractual and business relationships with YA and, instead, to engage in such business with Defendants and Company X.

128. Defendants, acting on behalf of Company X, had no valid justification in unfairly interfering with YA's relationships with Customer I and, in fact, employed improper means in their inducement of Customer I because they: (1) misused YA's confidential and proprietary information and trade secrets, including Customer I-specific pricing history, staffing models, forecasting methodologies, proposal structures, and non-public knowledge of Customer I's project timelines, budgeting practices, and personnel preferences, to undercut YA and submit competing bids while still employed by YA; and (2) breached their contractual and common-law duties of loyalty to YA by secretly competing with YA, submitting competing bids to Customer I during their YA employment, concealing their competitive activities, and exploiting access to YA's systems, tools, and proprietary resources—including Schedule Validator—to confer an unfair competitive advantage on themselves and Company X.

129. As a direct result of Defendants' and Company X's actions, YA has suffered damages in the form of lost business, lost business opportunities, and lost profits.

## **PRAYER FOR RELIEF**

For these reasons, YA respectfully requests that the Court enter a judgment against Defendants Benjamin Sparks, Matthew Sparks, Caleb Gibbs, and Company X awarding money damages and all other relief to which YA is entitled in contract, law, and equity, including but not limited to:

1. Judgment in favor of YA and against Defendants and Company X on Count One, awarding damages to YA for their violation of the Defend Trade Secrets Act, 18 U.S.C. § 1125 *et seq.*;

2. Judgment in favor of YA and against Defendants and Company X on Count Two, awarding damages to YA for their violation of the Missouri Uniform Trade Secrets Act ("MUTSA"), Mo. Rev. Stat. §  417.450 *et seq.*,

3. Judgment in favor of YA and against Defendants on Count Three, awarding damages to YA for their breach of contract;

4. Judgment in favor of YA and against the Defendants on Count Four, awarding damages to YA for their breach of duty of loyalty;

5. Judgment in favor of YA and against Defendants and Company X on Count Five, awarding damages to YA as a result their tortious interference with YA's business expectancy;

6. After due proceedings conclude, entry of injunctive relief prohibiting Defendants and Company X, and/or any person or entity acting in concert with them, from using, disclosing, or disseminating YA's trade secrets or confidential and proprietary information and requiring forensic examinations of the  computers and accounts possessed by Defendants and used to perform work for Company X or YA; and

7. After due proceedings conclude, an award of attorneys' fees, expert fees, and costs, and all other relief the Court finds appropriate.

Respectfully submitted,

JENKINS & KLING, P.C.

By: /s/ *Michael P. Stephens*
    Michael P. Stephens, #37491MO
    Katherine I. McLaughlin, #69734MO
    150 North Meramec, Suite 400
    St. Louis, MO 63105
    (314) 721-2525 Phone
    (314) 721-5525 Facsimile
    mstephens@jenkinskling.com
    kmclaughlin@jenkinskling.com